776 P.2d 458

**STATE of Idaho, Plaintiff–Appellant,**

v.

**Kenneth WEBER, James L. Hendershot and Sandra L. Hendershot, Defendants–Respondents.**

**No. 17698.**

Supreme Court of Idaho.

July 5, 1989.

**450**

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen. (argued), Boise, for plaintiff-appellant.

Roark, Donovan, Praggastis & Phillips, Hailey, for defendants-respondents. Ray Keith Roark argued.

JOHNSON, Justice.

This is a criminal case. The issue presented is whether the trial court correctly suppressed evidence obtained by the police as a result of the arrest and consent of Kenneth Weber. In suppressing the evidence, the trial court ruled that at the time of Weber's arrest the police did not have probable cause to arrest him and that Weber's consent to the search of his residence was the product of the illegal arrest. We affirm.

## I.

## THE TRIAL COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW.

The trial court made the following findings of fact:

1. On October 25, 1987, Officer Chuck Miller of the Sun Valley Police Department effected a traffic stop of a U–Haul truck in Sun Valley, Blaine County, State of Idaho. There were two (2) occupants in the vehicle: a driver— Rick Elliot, and a passenger—Kelly Youngstrom. The driver was arrested for Driving Under the Influence of Alcohol, I.C. Sec. 18–8004. The passenger was released. Following the arrest of Elliot, a search of the U–Haul truck revealed a large number of live marijuana plants.

2. Following his arrest, the driver, Rick Elliot, was questioned by the authorities. He told them he knew of a large marijuana growing operation near Carey, Idaho, and provided directions and a map showing the location. He gave the address of the farm as 20248 Highway 93, and said that a person named "Ken" lived there.

3. After the arrest of Rick Elliot, the Sun Valley Police Department interviewed Dennis Hildebrandt, who claimed he had knowledge of marijuana transactions by Kelly Youngstrom. Dennis Hildebrandt informed the Sun Valley Police Department that Kelly Youngstrom was going to call Dennis Hildebrandt at his room. With the consent of Dennis Hildebrandt, the Sun Valley Police Department arranged to transfer the call from Hildebrandt's dorm room to the Sun Valley Police Department. At approximately 5:35 p.m. on October 27th, 1987, Kelly Youngstrom telephoned Hildebrandt. During the course of the conversation, it was learned that in approximately ten to fifteen (10–15) minutes an unknown person would be going to Hildebrandt's room to pick up Four Hundred and no/100 Dollars ($400.00) owed to Youngstrom from a previous marijuana sale, and that this person was going to receive a percentage of the money. Kelly Youngstrom said that this person knew nothing about the marijuana transaction.

4. Officers Robinson and Miller arrived at Hildebrandt's dorm at approximately 5:50 p.m. on October 27, 1987 and observed two (2) people in the dorm. Officer Miller immediately recognized Kelly Youngstrom as the passenger in the U–Haul truck which he had stopped on October 25, 1987. Both of these individuals were subsequently arrested. During the officers' initial contact with the defendant, Kenneth Weber, the defendant incorrectly identified himself as Ken Winebender and stated that he lived at 20248 Highway 93, near Carey, Idaho. Weber was handcuffed and taken to the Sun Valley Police Department.

5. Officers Stuart Robinson of the Department of Law Enforcement and Chuck Miller of the Sun Valley Police Department had previously traveled to this location in the afternoon of October 27, 1987, and verified the location of the farm. On the premises located at 20248 Highway 93, approximately one and one-half (1½) miles south of Carey, Idaho, the law enforcement officers observed several buildings, including a red house, and a red barn with black visqueen plastic to cover windows and an exhaust fan. The use of black visqueen to cover windows and an exhaust fan are common in marijuana growing operations. A check of the power bills for this location were unusually high, which Officer Robinson testified is common for marijuana growing operations.

6. At the time of his arrest on the 27th day of October, 1987, no arrest warrant had been issued or complaint filed against Kenneth Weber.

7. Kenneth Weber was arrested on the 27th day of October, 1987, by Officers of the Sun Valley Police Department for the crime of Conspiracy to Deliver a Controlled Substance.

8. At the time of his arrest upon the above described charge, the police had no evidence whatever indicating that Kenneth Weber had participated in a delivery of any controlled substance. The only evidence the police had against Ken Weber at the time of his arrest was that he was in the company of another person, Kelly Youngstrom, whom the police did have probable cause to believe had delivered a controlled substance.

9. Almost immediately after arresting Ken Weber, the police asked for and obtained his consent to search his vehicle, although the police had no reason to suspect that the vehicle contained any controlled substance or contraband.

10. At the station, Kenneth Weber was read his Miranda rights in full. Weber did not request an attorney, nor did he invoke his right to remain silent. The defendant, Ken Weber, waived his Miranda Rights. The officers then asked Weber if he would consent to a search of the Carey farm. Weber signed a written consent to search form and gave one of the officers keys to the Carey farm. Weber's consent was knowing and voluntary, and there were no threats or promises made prior to the consent. There was no appreciable lapse of time between the illegal arrest of Kenneth Weber and his "consent" to the search. This "consent" was the direct product of Kenneth Weber's arrest.

11. Nothing in the record would tend to indicate that there was any danger following the arrest of Ken Weber that evidence would be lost, concealed or destroyed should the police take time to obtain a search warrant.

12. Although there was sufficient time and apparent opportunity to do so, the police made no effort to obtain a search warrant. Furthermore, the quantum of information which the police had in their possession at the time of the arrest of Ken Weber was insufficient to justify the issuance of a search warrant without further investigation.

13. Officers Miller and Robinson conducted a warrantless search of the Carey farm. The search uncovered a large scale marijuana growing operation with more than 1600 live marijuana plants in the barn.

Based on these findings, the trial court concluded:

14. The officers did not have probable cause to arrest Ken Weber....

15. Though Ken Weber's consent to search was voluntary and knowing, since it was given a short period of time following arrest, the taint of the illegal arrest was not purged and the consent was therefore invalid.

## II.

### THE STANDARD OF REVIEW ON APPEAL.

The State asserts that we should review the trial court's ruling on the motion to suppress de novo to determine whether there was probable cause for the arrest of Weber. While we agree that we should

freely review whether the trial court correctly applied the law to the facts, we defer to the trial court's findings of fact, unless they are clearly erroneous.

In *State v. Kirkwood*, 111 Idaho 623, 625, 726 P.2d 735, 737 (1986) this Court held that findings of a trial court in ruling on a motion to suppress "should be overturned only if not supported by substantial evidence." In a recent case our Court of Appeals set forth the standard of review to be applied to the ruling of a trial court suppressing evidence on constitutional grounds:

> The proper standard of review is one of deference to factual findings unless they are clearly erroneous. But, we may undertake a free review of the trial court's determination as to whether constitutional requirements have been satisfied in light of facts found.

*State v. Heinen*, 114 Idaho 656, 658, 759 P.2d 947, 949 (Ct.App.1988), *rev. den.*

### III.

### THE POLICE DID NOT HAVE PROBABLE CAUSE TO ARREST WEBER.

■ The State asserts that before Weber was arrested the police learned his identity and address by questioning him as part of an investigative detention. As the State sees this case, it was Weber's address that combined with the other information the State had previously learned that provided the probable cause for Weber's arrest. The State challenges the trial court's finding that the only evidence the police had against Weber at the time of his arrest was that he was in the company of Youngstrom. However, even the testimony of the police officers who arrested Weber supports the finding of the trial court.

When he was asked by defense counsel to recite what he thought constituted probable cause for arresting Weber, Officer Miller testified:

A. Yes, the act of going to the dorm to receive money from the sale of the marijuana that had been supplied to Hildebrandt by Youngstrom.

Q. Is that all?

A. Yes.

Officer Robinson, the other police officer who was present when Weber gave his address, testified:

Q. At the time Mr. Weber was placed in handcuffs, you did not, Officer Robinson, have probable cause in your mind to believe that he had committed a crime, did you?

A. No, sir.

Q. Were you told by any other officer that that officer had probable cause to believe that Mr. Weber had committed a crime?

A. No, sir.

Based on these admissions by the arresting officers, the finding of the trial court that Weber's being with Youngstrom at the dorm was the only evidence the police had against Weber is not clearly erroneous. The officers obviously did not attribute the same significance to Weber's address that the State would now have us give to it. Accepting the finding of the trial court to be true, we must then freely review the trial court's ruling that there was no probable cause for arresting Weber.

Our standard for determining whether there is probable cause for an arrest is well settled:

> Reasonable or probable cause has been defined as information that "would lead a man of ordinary care and prudence to believe or entertain an honest and strong suspicion that such person is guilty." [Citations omitted.]
>
> ....
>
> The adequacy of probable cause is not measured against the high standards required for conviction. [Citations omitted.] ... "[In] dealing with probable cause ..., as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." [Citation omitted.]

*State v. Alger*, 100 Idaho 675, 677, 603 P.2d 1009, 1011 (1979).

In *Alger* the Court held that the presence of the defendant in an apartment combined with other information the arresting officers had before they went there to execute a search warrant constituted probable cause to arrest the defendant for burglary. The arresting officers had been told by two informants that the informants had been in the apartment, which was occupied by several people including the defendant, and had observed specific items that had been stolen in recent burglaries. One of the other occupants of the apartment had told the informants that he and the defendant had been involved in stealing the items that were in the apartment. When the officers entered the apartment pursuant to the search warrant they had secured based on this information, they discovered items matching the description of some of the stolen merchandise. It was then that the officers arrested the defendant. The Court concluded that "the information received by the officers cast a different light on what might be otherwise innocent facts and enabled the officers to conclude that the items were indeed food stolen from the Farmer's Corner store." *Id.* at 678, 603 P.2d at 1012.

The facts in this case are a far cry from those in *Alger*. Here, the only evidence the police had against Weber at the time of his arrest was that he was with Youngstrom, whom the police did have probable cause to believe had delivered a controlled substance. Weber's mere presence was not sufficient to lead a person of ordinary care and prudence to believe or entertain an honest and strong suspicion that Weber was guilty of conspiring to deliver a controlled substance. The arrest was made without probable cause and was illegal.

## IV.

### THE FRUITS OF THE SEARCH AND SEIZURE SHOULD BE SUPPRESSED.

■ The State asserts that even if the arrest were illegal the search and seizure was valid because of the consent given by Weber. We disagree.

The trial court found that there was no appreciable lapse of time between the illegal arrest of Weber and his consent to the search and that the consent was the direct product of the arrest. As this Court said in *State v. Barwick*, 94 Idaho 139, 142, 483 P.2d 670, 673 (1971):

Generally where a person has consented to a search this removes a later objection that it was conducted without warrant. However, where the consent and search are accompanied by an illegal arrest, the events are so intertwined, one with the other, that the consent does not expunge the taint of the illegal arrest. [Citations omitted.] Since the search and the prior consent here were associated with an illegal arrest, the search was also illegal and none of the evidence discovered should have been admitted.

## V.

### CONCLUSION.

The order of the trial court suppressing the evidence seized by the State is affirmed.

BAKES, C.J., and BISTLINE and HUNTLEY, JJ., concur.

SHEPARD, J., sat, but did not participate in the opinion due to his untimely death.